## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Margaret Byrne,<br><br>          Plaintiff,<br><br>v.<br><br>Hunter Warfield, Inc., and<br>Nationwide Housing Corporation,<br><br>          Defendants. | Case No. 0:21-cv-2516<br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>INTRODUCTION</u>

1.      The United States Congress has found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. Congress wrote the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*., to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

2.      This action arises out of violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., by Defendant Hunter Warfield and its collection agents in their illegal efforts to collect a consumer debt from Plaintiff.

3.    This action also arises out of Defendant Nationwide's negligence, nuisance, and breach of contract under Minnesota law which led to this consumer debt.

## JURISDICTION

4.    Jurisdiction of this Court arises under U.S.C. § 1692k(d), 15 U.S.C. § 1681, and 28 U.S.C. § 1367 for any supplemental state law claims.

5.    Venue is proper because the acts and transactions occurred here, Plaintiff resides in Minnesota, and Defendants transact business here.

6.    Defendant Hunter Warfield has transacted business within the State of Minnesota by attempting to collect a debt from Plaintiff via the telephone and mails for a debt that was allegedly incurred while Plaintiff was located within and permanently residing within the State of Minnesota.

7.    Defendant Hunter Warfield  has transacted business within the State of Minnesota by operating a licensed collection agency, making collection calls into Minnesota, and directing debt collection activities to Minnesota and attempting to collect a debt from Plaintiff by falsely reporting this alleged debt on her consumer credit report while Plaintiff was located within and permanently residing within the State of Minnesota.

8.    Defendant Nationwide has transacted business within the State of Minnesota by owning, renting, and managing apartments in Minnesota.

9.    Defendant Nationwide has incorporated itself in the State of Minnesota.

## PARTIES

10.   Plaintiff Margaret Byrne (hereinafter "Plaintiff") is a natural person who resides in the City of Saint Paul, County of Ramsey, State of Minnesota, and is a "consumer"

as that term is defined by 15 U.S.C. § 1692a(3), and a "consumer" as that term is

defined by 15 U.S.C. § 1681a(c), or a person affected by a violation of those laws.

11.   Plaintiff has suffered an injury in fact that is fairly traceable to Defendant's conduct

and that is likely to be redressed by a favorable decision in this matter.

12.   Defendant Hunter Warfield, Inc. ( "Hunter Warfield") is a collection agency operating

from an office address of 4620 Woodland Corporate Blvd., Tampa, FL 33614, and is

a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6), is a "person" as

defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant

to 15 U.S.C. § 1681s-2(b).

13.   Defendant Nationwide Housing Corporation ("Nationwide") is a Minnesota

corporation and an apartment rental company, doing business as Thomas Lake Pointe

Apartments, LLC, from a principal business address of 6200 Shingle Creek Parkway,

Suite 300, Brooklyn Center, MN 55430.

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

14.   Consumer credit plays a major role in the lives of American consumers entering into

the American marketplace and the economic system in general. Fair and accurate

credit reporting acts as a gatekeeper to credit purchases, employment and income,

basic commercial services, insurance coverage, housing rentals, and a broad range

of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF

CONSUMER LAW 39-40 (2nd ed. 2006).

15.   Congress investigated and determined that the banking system is dependent upon

fair and accurate reporting, that inaccurate credit reports directly impair the

efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

16. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

17. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced her intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

18. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

19. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

20. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez et al.,

FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

21.   An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

22.   Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. (Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf).

## FACTUAL ALLEGATIONS

23.   Within one year immediately preceding the filing of this complaint, Defendants attempted to collect from Plaintiff a financial obligation that was primarily for personal, family or household purposes, and is therefore a "debt" as that term is

defined by 15 U.S.C. § 1692a(5), namely, an alleged obligation for an apartment rental in the State of Minnesota.

24.    Plaintiff disputes this alleged debt, the final bill on this account, and any remaining balance, and is represented by the undersigned counsel both with respect to this debt and to the claims made herein.

## ALLEGATIONS AS TO DEFENDANT HUNTER WARFIELD

### *Defendant Hunter Warfield's Illegal Add-On Charges to Debt*

25.    Sometime on or before December 2020, Plaintiff incurred an alleged debt to Thomas Lake Point Apartments in Eagan, Minnesota ("Debt") which was a $768 charge for alleged unpaid rent and damages after Plaintiff moved out of this apartment owned/controlled by Defendant Nationwide.

26.    Thomas Lake Point Apartments is a d/b/a for Defendant Nationwide.

27.    Plaintiff disputed this debt because Plaintiff had already paid $46.13 of it, which should have been taken off of the claimed amount, the remaining balance did not give Plaintiff a $250 credit to which she was entitled, and Plaintiff's apartment building had been infested with cockroaches and mold for months as a result of Defendant Nationwide's negligence.

28.    Defendant Hunter Warfield illegally added interest to this debt and falsely reported that interest as due and owing on this account on Plaintiff's consumer credit reports, despite the fact that Plaintiff has vigorously disputed the basis and amount of this debt making it an unliquidated amount.

CASE 0:21-cv-02516-WMW-DTS   Doc. 1   Filed 11/16/21   Page 7 of 46

29.  Plaintiff disagreed with the Defendant Hunter Warfield's assertion about interest on this disputed debt, never agreed to pay this interest or the principal amount and refused to pay this alleged debt since her apartment was infested with cockroaches.

30.  In June 2021, Plaintiff reviewed her consumer credit reports and noted an entry from Defendant Hunter Warfield on her that indicated that this $768 apartment rental fee debt with Defendant Nationwide had now inexplicably increased to $781.

31.  Defendant Hunter Warfield repeatedly added interest and/or late fees on this alleged debt, increasing the debt from its original amount.

32.  The FDCPA prohibits to addition of any amount over and above the principal amount of the debt unless that additional amount is permitted by the contract underlying the debt or otherwise permitted by law.

33.  Plaintiff never agreed to pay interest in any amount on this alleged debt because she did not agree that she even owed the alleged debt for the apartment rental because she was driven out by cockroaches that Defendant Nationwide failed to properly mitigate, control, and eliminate.  See *Tate v. Ballard,* 243 Minn. 353, 360, 68 N.W.2d 261, 266 (1954) ("Liability for interest is purely contractual, and a person is not chargeable therewith unless he has agreed to its imposition. County of Redwood v. Winona & St. Peter Land Co., 40 Minn. 512, 41 N.W. 465, 42 N.W. 473.")

34.  There is no agreement between Plaintiff and Defendants underlying this debt that permitted these collection fees by Defendant Hunter Warfield and these fees are not otherwise permitted by law.

-7-

35. Defendant Hunter Warfield's demands from Plaintiff for payment for amounts not due and owing on this obligation was fraud, because it intended that Plaintiff would rely on its representations as to the amount of additional interest on the obligation, and Plaintiff in fact relied on those material misrepresentations to Plaintiff's detriment.

36. It was a false and deceptive debt collection practice for Defendant Hunter Warfield to misrepresent the amount due and owing by Plaintiff for this debt.

37. Defendant Hunter Warfield's addition of at least $13 in late charges to Plaintiff's alleged debt to Defendant Nationwide was also a violation of numerous and multiple provisions of the FDCPA with respect to Defendant Hunter Warfield.

38. The above-described communications and conduct from Defendant Hunter Warfield toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(5), 1692e(10), 1692e(11), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

39. The above-described collection conduct by Defendant Hunter Warfield in its efforts to collect this alleged debt from Plaintiff were oppressive, deceptive, misleading, unfair and illegal communications in an attempt to collect this alleged debt, all done in violation of numerous and multiple provisions of the FDCPA.

40. These collection actions taken by Defendant Hunter Warfield, and the collection employees employed by it, were made in violation of multiple provisions of the FDCPA, including but not limited to all of the provisions of those laws cited herein.

41.    These violations by Defendant Hunter Warfield were knowing, willful, negligent and/or intentional, and it did not maintain procedures reasonably adapted to avoid any such violations.

42.    Defendant Hunter Warfield's collection efforts with respect to this alleged debt from Plaintiff caused Plaintiff to suffer concrete and particularized harm because the FDCPA provides Plaintiff with the legally protected right to be treated fairly and truthfully with respect to any action for the collection of any consumer debt.

43.    Defendant Hunter Warfield's deceptive, misleading and unfair representations with respect to its collection effort were material misrepresentations that affected and frustrated Plaintiff's ability to intelligently respond to Defendant's collection efforts because Plaintiff could not adequately respond to the Defendant's demand for payment of this debt.

***Fair Credit Reporting Act Violations by Defendant Hunter Warfield***

44.    Sometime on or about July 4, 2021, Plaintiff got notification from her credit monitoring service that Defendant Hunter Warfield had added a negative tradeline entry to her consumer credit reports.

45.    Plaintiff then began reviewing her credit reports.

46.    Plaintiff discovered that Defendant Hunter Warfield had added a collection tradeline entry on her Equifax Credit report for this alleged debt on or about July 4, 2021.

47.    Plaintiff thereafter obtained her FICO® score on September 28, 2021, and discovered that the addition of the Defendant Hunter Warfield's negative tradeline for this alleged debt took her credit score down to 690, from 816, a huge drop of

126 points.

48.    On October 16, 2021, Plaintiff disputed this account Defendant Hunter Warfield had furnished to Equifax.

49.    Specifically, on October 16, 2021, Plaintiff filed a detailed written dispute with Equifax about this account listed by Defendant Hunter Warfield and included a detailed rendition of both the cockroach and mold conditions.

50.    Despite such written dispute under the FCRA from Plaintiff, Defendant Hunter Warfield has not removed the negative tradeline from Plaintiff's Equifax credit report.

51.    Plaintiff disputed the false and fraudulent account information with Equifax credit reporting agency pursuant to 15 U.S.C. § 1681i.

52.    On or about October 16, 2021, Plaintiff disputed the Defendant Hunter Warfield's negative tradeline of this alleged debt directly with the responsible credit reporting agency, Equifax, by doing a written online dispute of the item directly with it.

53.    Thereafter, upon good faith information and belief, Equifax forwarded Plaintiff's dispute information to Defendant Hunter Warfield for investigation as required by 15 U.S.C. § 1681(a)(2).

54.    Upon good faith information and belief, Equifax sent an automated consumer dispute verification ("ACDV") to Defendant Hunter Warfield regarding the disputed account on this alleged debt.

55.    On or about October 26, 2021, Plaintiff received a letter back from Equifax indicating that it had received Plaintiff's written dispute of this fraudulent account

but confirmed it as accurate with Defendant Hunter Warfield.

56.   According to Equifax, Defendant Hunter Warfield verified that the dispute account belonged to Plaintiff and was accurately reporting on her credit report, in violation of 15 U.S.C. § 1681s-2(b).

57.   Defendant Hunter Warfield's reporting adversely and/or negatively affected Plaintiff's credit profile when Defendant Hunter Warfield was aware that Plaintiff's dispute was legitimate.

58.   Defendant Hunter Warfield violated 15 U.S.C. §1681s-2(b) when it received the notification of dispute from Equifax concerning the Plaintiff's disputed account and thereafter failed to conduct a reasonable investigation and failed to delete the fraudulent account.

59.   Plaintiff obtained and reviewed her credit report again on November 8, 2021.

60.   Specifically, Plaintiff's TransUnion credit report dated November 8, 2021, still contained the Defendant Hunter Warfield's fraudulent account and still listed this collection account tradeline against Plaintiff.

61.   As a result of Defendant Hunter Warfield's inaccurate and malicious reporting to the Equifax credit reporting agency that Plaintiff's fraudulent account was accurate and in collections, Plaintiff has suffered reduced credit, emotional distress, embarrassment, frustration, distraction from work, loss of sleep, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

62.   Plaintiff is entitled to attorney's fees and costs from Defendant Hunter Warfield pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

63. Defendants' false and negative credit reporting caused Plaintiff's credit score to go down considerably during this time frame.

64. Plaintiff's credit profile, save and accept for Defendant Hunter Warfield's reporting of the fraudulent account, is essentially impeccable and pristine.

65. Plaintiff takes great care in working and guarding her credit report/score and is now embarrassed and humiliated that her score is not perfect as it should be without the Defendant Hunter Warfield's adverse account.

66. Defendants' conduct has caused Plaintiff to delay refinancing opportunities to obtain the best possible rates and/or obtaining other credit until the Defendant Hunter Warfield's adverse and harmful reporting is removed from her credit profile with Equifax.

## ALLEGATIONS AS TO DEFENDANT NATIONWIDE

### *Breach of Contract, Warranty of Habitability, and Negligence*

### *by Defendant Nationwide*

67. The Minnesota Supreme Court recently held:

> The covenants of habitability, made a part of every lease in this state, are codified at section 504B.161, which states that landlords covenant, among other things:
>
>> (1) that the premises and all common areas are fit for the use intended by the parties;
>>
>> (2) to keep the premises in reasonable repair during the term of the lease or license ...; [and]
>>
>> (4) **to maintain the premises in compliance with the applicable health and safety laws of the state, and of the local units of government** ....

Minn. Stat. § 504B.161, subd. 1(a)(1)–(2), (4). The statute states that "[t]he parties to a lease or license of residential premises may not waive or modify the covenants imposed by this section." *Id.*, subd. 1(b). The statute further requires that "[t]her section shall be liberally construed," *id.*, subd. 3, and that "[t]he covenants contained in this section are *in addition to any covenants or conditions imposed by law* or ordinance or by the terms of the lease or license." *Id.*, subd. 4 (emphasis added).

*Ellis v. Doe*, 924 N.W.2d 258, 261 (Minn. 2019) (bold emphasis added).

68.   A contract existed between Plaintiff and Defendant Nationwide.

69.   The contract was an apartment lease agreement executed between Plaintiff and Defendant Nationwide on or about October 31, 2019, for an apartment in Eagan, Minnesota ("Contract").

70.   The Contract contained an explicit offer from Defendant Nationwide, a written acceptance by Plaintiff, and consideration in the form of rent paid by Plaintiff in exchange for an apartment supplied by Defendant Nationwide.

### *Cockroaches*

71.   Sometime in or around the summer of 2020, cockroaches arrived in Plaintiff's apartment from an adjoining apartment unit.  Here are three pictures of actual cockroaches that were infesting Plaintiff's apartment:



**Fig. 1 – Various Cockroaches in Plaintiff's Apartment**

72.    The Federal Centers for Disease control has weighed in on the dangerous nature of

cockroach infestations in housing:

> Housing-related health concerns include asthma episodes triggered by
> exposure to dust mites, **cockroaches**, pets, and rodents. The existence of
> cockroaches, rats, and mice mean that they can also be vectors for significant
> problems that affect health and well-being. **They are capable of
> transmitting diseases to humans.**
>
> …
>
> The cockroach is considered an allergen source and an asthma trigger for
> residents. Although little evidence exists to link the cockroach to specific
> disease outbreaks, it has been demonstrated to carry *Salmonella
> typhimurium, Entamoeba histolytica*, and the poliomyelitis virus. In addition,
> Kamble and Keith note that most cockroaches produce a repulsive odor that
> can be detected in infested areas. **The sight of cockroaches can cause
> considerable psychologic or emotional distress in some individuals. They
> do not bite, but they do have heavy leg spines that may scratch.**
>
> …
>
> As a group, **they tend to prefer a moist, warm habitat** because most are
> tropical in origin. Although some tropical cockroaches feed only on
> vegetation, cockroaches of public health interest tend to live in structures and
> are customarily scavengers. Cockroaches will eat a great variety of materials,
> including cheese and bakery products, but they are especially fond of starchy
> materials, sweet substances, and meat products.
>
> **Cockroaches are primarily nocturnal. Daytime sightings may indicate**

> **potentially heavy infestations.** They tend to hide in cracks and crevices and can move freely from room to room or adjoining housing units via wall spaces, plumbing, and other utility installations.

https://www.cdc.gov/nceh/publications/books/housing/cha04.htm   last   accessed

October 14, 2021 (emphasis added; footnotes omitted).

73. Plaintiff immediately notified Defendant Nationwide's management of the cockroaches and demanded that it undertake appropriate extermination measures to eliminate them.

74. Thereafter, Defendant Nationwide negligently failed to undertake effective and appropriate measures to eliminate these cockroaches from Plaintiff's apartment rendering it essentially unlivable and constructively evicting Plaintiff from the premises because it refused to conduct a complete extermination effort throughout the entire building

75. Plaintiff saw cockroaches in her kitchen, bathroom, bedroom and living areas for months and months.

76. Plaintiff was emotionally traumatized by the fear of cockroaches on her food and in or around her bed as she slept and communicated her concerns to Defendant Nationwide.

### *Water Leaks and Black Mold*

77. In or around August 2020, Plaintiff discovered black mold growing on the ceiling of her apartment utility closet along with a wet floor in her apartment.  Here is a picture of that mold in Plaintiff's apartment:



**FIG. 2 – Black Mold in Plaintiff's Apartment Utility Closet**

78. Plaintiff complained to Defendant Nationwide's management office about this mold immediately after discovering it.

79. Plaintiff was advised by Defendant Nationwide's maintenance employee that a tenant in the apartment above this mold had a leaky water heater in need of repair.

80. Defendant Nationwide failed to offer the Plaintiff, or other tenants in the affected apartment building, alternative housing or hotels until this mold was fully mitigated and removed, and the leaky water heater was replaced.

81. Defendant Nationwide failed to turn off the leaking water heater above Plaintiff's

apartment which allowed the leaking to continue until the unit was replaced six days later.

82. Plaintiff had several boxes stored in this utility closet which were damaged, and the contents rendered unusable and had to be thrown out.

83. Instead, Defendant Nationwide simply spray-painted over this mold with a can of white paint and told Plaintiff that they were waiting for a new water heater to arrive the following week, but never removed the mold-infested and damaged wall board or ceiling, or further evaluated the damage that this water leak had caused to Plaintiff's living space.

84. The City of Eagan, Minnesota, Municipal Code provides in pertinent part:

> **The operation of residential rental properties is a business enterprise that entails certain responsibilities.** Owners and operators are responsible to take such reasonable steps as are necessary to ensure that the citizens of the city who occupy such rental properties may pursue the quiet enjoyment of the normal activities of life in their surroundings that are: safe, secure and **sanitary**; free from noise, nuisances or annoyances; and **free from condition that endangers the health or safety of persons** and security of property.

*City of Eagan, Minnesota Municipal Code Sec. 6.55, Subd. 1* (emphasis added).

85. Eagan City Code also defines any unsanitary structure, such as the apartment building owned by Defendant Nationwide and rented by Plaintiff as part of the Contract, to be a public nuisance:

*Building and structure appearance and maintenance requirements.*

> A.    **Any building or structure** other than accessory buildings on farms **is a public nuisance** if its exterior does not comply with the following requirements:

> 1.      An owner, lessee, or occupant of property or a dwelling may not allow the accumulation of dirt or filth on the exterior premises occupied or controlled in a manner that could create a health hazard to the dwelling occupants or the general public. **All exterior property and premises shall be maintained in a clean, safe and sanitary condition.**

*City of Eagan, Minnesota Municipal Code Sec. 10.53, Subd. 1* (emphasis added).

86.     Defendant Nationwide intentional and/or negligently failed to simultaneously provide extermination services to every apartment until in the Plaintiff's building, thereby allowing the cockroaches to return to Plaintiff's apartment.

87.     As a result, Plaintiff suffered from a cockroach infestation in her apartment for months, all the while Plaintiff paid $1,365 a month in rent to Defendant Nationwide.

88.     **Defendant Nationwide also** failed to take reasonable steps to prevent the spread of the second-floor cockroaches to Plaintiff's first-floor unit as prescribed by its contracted pest extermination service, Guardian Pest Solutions.

89.     The exterminator told Plaintiff that the cockroaches had spread into Plaintiff's first-floor apartment from a second-floor cockroach infestation that Defendant Nationwide had refused to properly mitigate over her objections.

90.     A manager employed by Defendant Nationwide was present in Plaintiff's apartment when this specific conversation took place amongst Plaintiff, the exterminator, and the Defendant Nationwide's employee.

91.     Defendant Nationwide failed to properly address the mold problems that Plaintiff identified by safely removing and cleaning up the mold and water damage.

92.     The CDC has also weighed in on the dangers of mold inside of dwellings:

**It is recommended that porous materials (e.g., ceiling tiles, wallboards, and fabrics) that cannot be cleaned be removed and discarded.** In severe cases, clean-up and repair of mold-contaminated buildings may be conducted using methods similar to those used for abatement of other hazardous substances such as asbestos. For example, in situations of extensive colonization (large surface areas greater than 100 square feet or where the material is severely degraded), extreme precautions may be required, including full containment (complete isolation of work area) with critical barriers (airlock and decontamination room) and negative pressurization, personnel trained to handle hazardous wastes, and the use of full-face respirators with HEPA filters, eye protection, and disposable full-body covering.

https://www.cdc.gov/nceh/publications/books/housing/cha05.htm   last   accessed

October 14, 2021 (emphasis added; footnotes omitted).

93.     Defendant Nationwide's conduct, errors, and omissions, in failing to properly

mitigate both the cockroaches and the mold issues in the Plaintiff's apartment

building resulted in a breach of the warranty of habitability and led to a reinfestation

of cockroaches into Plaintiff's apartment.

94.     Plaintiff's person and personal property was exposed in the moldy and wet

apartment closet that was part of the rental Contract she signed with Defendant

Nationwide.

95.     Plaintiff's person and personal property, including her food, clothing, bedding, and

toiletries were exposed to cockroaches in the apartment that was basis of the rental

Contract she signed with Defendant Nationwide.

96.     The debt at issue in this case arose directly out of Defendant Nationwide's repeated

assertions that Plaintiff owed this money under the Contract, despite its myriad

breaches and Plaintiff  repeated written and verbal disputes of this alleged debt

97.    Defendant Nationwide failed to promptly take reasonable cockroach-infestation mitigation steps—strongly recommended by its contracted exterminator, Guardian Pest Solutions—after they treated a cockroach-infested second floor unit, and as a direct result Plaintiff was subjected to months of living in an infested and unsafe apartment.

98.    Plaintiff was left without the use of the apartment's kitchen for the last three months of the tenancy and was extremely fearful of cockroaches landing on her body during the night.

99.    Ultimately, Defendant Nationwide's negligence and breach of the Contract caused Plaintiff to have to move out of the apartment entirely.

100.   Plaintiff incurred months of living with cockroaches in her bedroom, living, kitchen, and bathroom because of Defendant Nationwide's negligence and its breach of the Contract.

101.   Plaintiff incurred several thousand dollars in rent and moving expenses as a result of this breach of Contract by Defendant Nationwide, including paying more than $4,800 rent while cockroaches roamed in her apartment and paying $608 in moving expenses to relocate herself.

102.   Instead of promptly and fully addressing the unsanitary and vile cockroach and mold situations in Plaintiff's home, existing in violation of city code and state law, Defendant Nationwide instead sent Plaintiff to a debt collector after she moved out who thereafter damaged her excellent credit rating and began debt collecting from her.

103.   Defendant Nationwide is not entitled to any monies during the time Plaintiff suffered from cockroaches and/or mold in her unsanitary apartment.

104.   Defendant breached its warranty of habitability, it breached the Contract, and it breached its duty of good faith and fair dealing with Plaintiff.

105.   Defendant Nationwide been unjustly enriched by Plaintiff as a result of its conduct and misconduct in this case.

106.   Plaintiff has suffered serious harm and damages as a result of being subjected to Defendant Nationwide's negligence.

107.   Plaintiff has now been subjected to debt collections because Defendant Nationwide ignored Plaintiff's warnings to properly exterminate its cockroach infestation, and remediate and clean up its mold infestation, as required by Eagan Municipal Code and state law, instead of properly carrying out its legal obligations to Plaintiff in her apartment building.

*Further Creation and Maintenance of a Nuisance Property*

*by Defendant Nationwide in Violation of State and Federal Indoor Air Quality Law*

108.   As further described above, Defendant Nationwide consistently failed to maintain the Plaintiff's Rental Property in violation of city ordinances and thereby created a nuisance property to Plaintiff's damage.

109.   In addition, Defendant Nationwide located and maintained a commercial garage exhaust fume chimney at ground level immediately outside of Plaintiff's apartment.

110.    Starting around June 2020, Plaintiff repeatedly and vocally objected to the continuous use of this exhaust vent located adjacent to the deck of her apartment because it spewed unfiltered car exhaust into her home.

111.    Below as Fig. 3 and 4 are pictures of Defendant Nationwide's exhaust vent that was located approximately 10 feet from the back of Plaintiff's apartment deck.

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/





**FIG. 3 and 4 – Garage Exhaust Vent Outside Plaintiff's Apartment Deck**

112.   Despite Plaintiff's repeated complaints to Defendant Nationwide's management about this car exhaust chimney and the associated exhaust fumes pouring into her home, Defendant Nationwide did nothing to abate this nuisance but instead caused even more of a nuisance by manually running the system, almost continuously.

113.   Plaintiff had a right to an apartment that was not subject to poisonous automobile exhaust intrusion on a near-continual basis into her apartment.

114.   Defendant Nationwide could have and should have either entirely relocated this exhaust vent to another location of raised it far off of the ground to permit the elimination of these dangerous exhaust fumes that entered Plaintiff's apartment.

115.   Instead, Defendant Nationwide created and maintained this nuisance in the form of an exhaust vent at ground level outside Plaintiff's deck, all to Plaintiff's detriment.

116.   The location of this exhaust violates Minnesota Mechanical code laws  which specifies in pertinent part:

> **501.3 Exhaust Discharge**
> The air removed by every mechanical exhaust system shall be discharged outdoors at a point **where it will not cause a nuisance** and not less than the distances specified in IMC Section 501.3.1. **The air shall be discharged to a location from which it cannot again be readily drawn in by a ventilating system.** Air shall not be exhausted into an attic or crawl space and the exhaust system shall be equipped with a backdraft damper at the point of discharge.

> https://up.codes/viewer_export/juris_key/minnesota/pub/minnesota_mechanical_code_2015/ref/501.3 (bold underline added). Last Accessed November 7, 2021.

117.   The exhaust from Defendant Nationwide's vent caused Plaintiff to suffer actual harm in the form of eye irritation, difficulty breathing in her apartment, and the inability to enjoy the outside deck of her apartment as other tenants did.

118.   Defendant Nationwide's employees operated this vent immediately outside Plaintiff's apartment illegally because Minnesota Law requires venting systems like this either to run continually or to be triggered by fume sensors.

119.   Pertinent Minnesota law states:

> **404.1 Enclosed parking garages. <u>Mechanical ventilation systems for enclosed parking garages shall operate automatically upon detection of certain gas concentrations.</u>** Enclosed parking garages shall be equipped with a carbon monoxide (CO) detector and a nitrogen dioxide ($NO_2$) detector. The mechanical ventilation system shall activate upon detection of a CO level of 25 parts per million (ppm) or greater, a $NO_2$ level of 3 ppm or greater, or both. Such detectors shall be listed in accordance with UL 2075 and installed in accordance with their listing and manufacturers' instructions.

**Minn.Admin.R. 1346.0404 SECTION 404 GARAGES (**bold underline added**).**

120.   In fact, Defendant Nationwide's employees operated this garage ventilation system manually, by turning it on and off at their discretion, and in violation of Minnesota law and thereby created a hazardous nuisance property, all to Plaintiff's detriment.

121.   The federal Environmental Protection Agency ("EPA") regulates indoor air quality within apartments such as Defendant Nationwide's building, and has issued warnings about automobile exhaust entering enclosed living spaces:

> Combustion odors can indicate the existence of a serious problem. One combustion product, carbon monoxide, is an odorless gas. **Carbon monoxide poisoning can be life-threatening.**

*Building Air Quality: A Guide for Building Owners and Facilities Managers* (December 1991), p. 100, available at https://www.epa.gov/sites/default/files/2014-08/documents/iaq.pdf, last accessed November 12, 2021.

122.    The EPA has elegantly explained the factors affecting indoor air quality such as the Plaintiff's apartment living space:

> The indoor environment in any building is a result of the interaction between the site, climate, building system (original design and later modifications in the structure and mechanical systems), construction techniques, contaminant sources (building materials and furnishings, moisture, processes and activities within the building, and outdoor sources), and building occupants.

> The following four elements are involved in the development of indoor air quality problems:

> **Source:** there is a source of contamination or discomfort indoors, outdoors, or within the mechanical systems of the building.

> **HVAC:** the HVAC system is not able to control existing air contaminants and ensure thermal comfort (temperature and humidity conditions that are comfortable for most occupants).

> **Pathways:** one or more pollutant pathways connect the pollutant source to the occupants and a driving force exists to move pollutants along the pathway(s).

> **Occupants:** building occupants are present. It is important to understand the role that each of these factors may play in order to prevent, investigate, and resolve indoor air quality problems.

> It is important to understand the role that each of these factors may play in order to prevent, investigate, and resolve indoor air quality problems.

*Id.* at p.5.

123.    In fact, some of the specific (and commonsense) recommendations that the EPA has for dealing with automobile exhaust entering buildings from underground garages

adjacent occupied spaces include "modify[ing] the venting or HVAC system to prevent backdrafting." *Id.* at p.100.

124. Despite the ready availability of the EPA's federal regulation, rules, guidelines, and requirements about the abatement of dangerous gases such as carbon monoxide produced automobiles in underground parking garages, like those found at Defendant Nationwide's garage, Defendant Nationwide ignored its responsibilities to properly mitigate these harms to Plaintiff and instead maintained an on-going nuisance to her health in violation of state and federal law air quality laws.

## TRIAL BY JURY

125. Plaintiff is entitled to and hereby respectfully demands a trial by jury on all issues so triable.

## CAUSES OF ACTION

## COUNT I.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. § 1692 *et seq.*

## (DEFENDANT HUNTER WARFIELD)

126. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

127. The foregoing acts and omissions of Defendant Hunter Warfield and its agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 *et seq.*, with respect to Plaintiff.

128.   As a result of Defendant Hunter Warfield's violations of the FDCPA, Plaintiff is entitled to statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3), from Defendant herein.

## COUNT II.

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

## U.S.C. § 1681 *et seq.*

## (DEFENDANT HUNTER WARFIELD)

129.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

130.   Defendant Hunter Warfield violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it and documentation provided by Plaintiff, and failing to update and/or remove the inaccurate tradeline or, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Codes) Code to "XB."

131.   As a result of Defendant Hunter Warfield's violations of the FCRA, Plaintiff has suffered actual damages not limited to out-of-pocket expenses, detriment to her credit rating, emotional distress, embarrassment, mental anguish, anxiety, and humiliation in an amount to be determined at trial.

132. Defendant Hunter Warfield's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

133. Alternatively, Defendant Hunter Warfield's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

134. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Hunter Warfield in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III.

## FRAUD

## (DEFENDANT HUNTER WARFIELD)

135. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

136. The Minnesota Court of Appeals has held:

> A prima facie case of fraudulent misrepresentation requires the plaintiff to establish that
>
> > (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the other party suffered pecuniary damage as a result of the reliance.
>
> *Hoyt Props., Inc.,* 736 N.W.2d at 318 (quotation omitted). "A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts

that render the facts that are disclosed misleading." *M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn.1992).

Beckman v. Wells Fargo Bank, N.A., No. A15-1819, 2016 WL 5640664, at *5–6 (Minn. Ct. App. Oct. 3, 2016).

137. During the collection communications transmitted by Defendant Hunter Warfield to Plaintiff in the past year, Defendant Hunter Warfield repeatedly and falsely represented to that Plaintiff was obligated to pay interest and other charges on these obligations in excess of the amounts permitted by Minnesota law, when, in material fact, Plaintiff was not so obligated.

138. Defendant Hunter Warfield knew that the alleged debt it was attempting to collect from Plaintiff had been padded with illegal and impermissible collection fees, and that therefore Plaintiff had no legal obligation to pay it, but it withheld that fact from Plaintiff and instead told Plaintiff that she must pay it.

139. As a licensed Minnesota collection agency, Defendant Hunter Warfield knew or should have known that it had no right to add impermissible collection fees under the FDCPA or fees that were not provided under the contract or otherwise permitted by law. See Kojetin v. C U Recovery, Inc., 212 F.3d 1318 (8th Cir. 2000).

140. Plaintiff has suffered actual pecuniary damages as a result of this Defendant Hunter Warfield's deliberate fraudulent misrepresentations of these material facts.

141. Defendant Hunter Warfield's misrepresentations that Plaintiff owed this increasing amount, when Plaintiff in fact did not, were material misrepresentations of fact

because they influenced Plaintiff's judgment and decisions regarding how to deal with the alleged debt.

142. Defendant Hunter Warfield knew that its misrepresentations to Plaintiff were false at the time Defendant Hunter Warfield made them.

143. Defendant Hunter Warfield's misrepresentations were made intending that Plaintiff would rely on them.

144. Plaintiff reasonably relied upon and acted upon Defendant Hunter Warfield's misrepresentations and suffered damages in wasted time seeking legal advice and the costs of litigation in this matter to vindicate Plaintiff's rights under the FDCPA, as well as other damages, including lost work time, upset, frustration, embarrassment, and stress.

## COUNT IV.

## NEGLIGENCE

## (DEFENDANT NATIONWIDE)

145. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

146. The foregoing acts and omissions of Defendant Nationwide and its agents constitute negligence with respect to Plaintiff.

147. As a result of Defendant Nationwide's negligence, Plaintiff is entitled to actual damages and reasonable attorney's fees and costs pursuant to Minnesota Law, from Defendant Nationwide.

## COUNT V.

**BREACH OF CONTRACT**

**(DEFENDANT NATIONWIDE)**

148.  Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

149.  Plaintiff had a contract in the form of an offer by Defendant Nationwide to provide a clean and sanitary apartment, and acceptance by Plaintiff of that offer, and consideration exchanged between the parties.

150.  The foregoing acts and omissions of Defendant Nationwide and its agents constitute breach of contract with respect to Plaintiff.

151.  As a result of Defendant Nationwide's breach of contract, Plaintiff is entitled to actual damages and reasonable attorney's fees and costs pursuant to Minnesota Law, from Defendant Nationwide herein.

**COUNT VI.**

**BREACH OF GOOD FAITH AND FAIR DEALING**

**(DEFENDANT NATIONWIDE)**

152.  Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

153.  Defendant Nationwide had a duty to act in good faith by properly maintaining Plaintiff's apartment and ensuring it was free of cockroaches.

154.  Defendant Nationwide negligently failed in these duties and failed to maintain any reasonable systems that would have prevented such failures against Plaintiff.

155.  Defendant Nationwide breached its duty to act in good faith by intentionally failing

to comply with city and state laws governing the habitability of Plaintiff's apartment.

156.   Plaintiff has been seriously damaged by Defendant Nationwide's multiple breaches of good faith and fair dealing in this Contract and is entitled to actual damages, compensatory damages, expectancy damages, costs and attorney's fees.

## COUNT VII.

## UNJUST ENRICHMENT

## (DEFENDANT NATIONWIDE)

157.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

158.   Defendant Nationwide has been unjustly enriched by retaining Plaintiff's funds while she was forced to live in an unsanitary apartment infested with cockroaches.

159.   Defendant Nationwide is not entitled to that benefit.

160.   It would be unjust to allow Defendant Nationwide to retain that benefit.

161.   Plaintiff is entitled to judgment against Defendant Nationwide in an amount to be proven at trial for this unjust enrichment.

## COUNT VIII.

## NUISANCE DAMAGES - Minn.Stat. § 561.01

## (DEFENDANT NATIONWIDE)

162.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

163.   Plaintiff is entitled to actual damages for the nuisance conditions caused by

Defendant Nationwide pursuant to Minnesota Statutes § 561.01, at a jury trial on the merits.

164.   Plaintiff has stated an actionable claim in nuisance against Defendant Nationwide by presenting evidence that the Defendant Nationwide has intentionally maintained a condition causing nuisance harm.

165.   A claim of private nuisance does not require proof that the nuisance harm resulted from a "wrongful" act except to the extent the Plaintiff must prove fault on the part of the Defendant. Wendinger v. Forst Farms, Inc., 662 N.W.2d 546 (Minn.App.2003), review denied.

166.   Minn.Stat. § 561.01 states:

> Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.

167.   Defendant Nationwide's refusal to properly exterminate dangerous cockroaches, to mitigate dangerous mold, and to eliminate a dangerous and obnoxious underground garage exhaust vent immediately outside of Plaintiff's apartment each constitute a "nuisance" to Plaintiff, all to Plaintiff's damage.

168.   Defendant Nationwide's apartment was harmful to the health of Plaintiff, indecent and offensive to the Plaintiff's senses, and was an obstruction to the free use of the Plaintiff's apartment, which caused an immediate danger to Plaintiff and any of her

guests, all to Plaintiff's damage.

169.   By creating and maintaining these nuisances, Defendant Nationwide caused an immediate and substantial harm to Plaintiff's free and fair use of her apartment, all to Plaintiff's damage.

170.   Defendant Nationwide's nuisances materially and substantially interfered with the comfortable enjoyment of life or property for Plaintiff in comparison with the standards of ordinary people in the area in which the Plaintiff's apartment was located, all to Plaintiff's damage.

171.   Defendant Nationwide intentionally and wrongfully created this nuisance rental property by purposely causing these nuisances, by knowing that its conduct and failure to act were the proximate cause of the nuisances, and by knowing that these nuisances were substantially certain to result, all to Plaintiff's damage.

172.   Defendant Nationwide negligently created each nuisance by directly causing the nuisance by their failure to use reasonable care, all to Plaintiff's damage.

173.   Defendant Nationwide was negligent because they have allowed these malignant nuisance conditions to occur on the rental property, which is something a reasonable person would not do in similar circumstances, all to Plaintiff's damage.

174.   Defendant Nationwide has failed to do something a reasonable person would do in similar circumstances, namely, to properly maintain this rental property, all to Plaintiff's damage.

175.   Plaintiff is therefore entitled to an award of actual damages for the nuisance conditions caused by Defendant Nationwide pursuant to Minnesota Statutes §

561.01, in an amount in an amount to be determined by jury, together with costs and disbursements herein and such other relief as the Court deems appropriate.

## COUNT IX.

## DECLARATORY RELIEF

## (ALL DEFENDANTS)

176.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

177.   An actual controversy has arisen and now exists between and amongst Plaintiff, Defendant Hunter Warfield and Defendant Nationwide concerning their respective rights and duties in that Plaintiff contends that Defendant Nationwide breached its contract with Plaintiff and violated city and state laws with respect to trying to charge her rent for a cockroach-infested apartment, and Defendant Hunter Warfield violated federal law it its attempts to collect this debt; and, whereas Defendant Nationwide apparently disputes this contention and by its conduct contends that it had no duties to Plaintiff and that Plaintiff owes these remaining amounts that it has sent to debt collections, namely, Defendant Hunter Warfield.

178.   Plaintiff desires a judicial determination of Defendant Nationwide's and and Defendant Hunter Warfield's rights and duties, and if they so exist, the extent of the liability of Plaintiff to Defendant Nationwide and Defendant Hunter Warfield, if any, and vice versa.

179.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain Plaintiff's rights and duties

because Plaintiff's personal business affairs are seriously impaired by and Defendant Hunter Warfield's continued collection efforts of Defendant Nationwide's alleged debt, and Plaintiff is otherwise suffering a financial burden by this unsettled state of affairs with these Defendants.

180.   Plaintiff has already suffered from damage by having to move out of her apartment because it was cockroach and mold-infested, has had her credit damaged, and has been subjected to debt collection activity by these Defendants.

181.   Declaratory relief is therefore appropriate in order to bring peace to the parties and prevent either of these Defendants from causing further unwarranted and unjust damage to Plaintiff.

## COUNT X.

## RESPONDEAT SUPERIOR LIABILITY

## (ALL DEFENDANTS)

182.   The acts and omissions herein of the individuals employed by these Defendants, and those employed as agents of each Defendant, who acted or failed to act with respect to Plaintiff as further described herein, were committed within the time and space limits of their agency relationship with their principals, the Defendants.

183.   The acts and omissions by these individuals were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by these Defendants.

184.   By committing these acts and omissions against Plaintiff, these individuals were motivated to benefit their principals, the Defendants.

185.   Each Defendant is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of city, state and federal law by their employees, including but not limited to violations of the laws cited herein in with respect to Plaintiff.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered as follows:

### *As to Defendant Hunter Warfield Only*

- for an award of actual and statutory damages of $1,000.00 pursuant to 15 U.S.C. §1692k(a)(2)(A) against Defendant Hunter Warfield and for Plaintiff;

- for an award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) against Defendant Hunter Warfield and for Plaintiff;

- for an award of actual, statutory and punitive damages, and costs and attorneys' fees against Defendant Hunter Warfield for violations of the FCRA and for Plaintiff, pursuant to 15 U.S.C. §§ 1681n and 1681o, in an amount to be determined at trial;

- for actual damages for fraud that were directly caused by relying on the fraudulent misrepresentations made by Defendant Hunter Warfield to Plaintiff regarding this alleged debt;

### *As to Defendant Nationwide Only*

- for actual and compensatory damages for Negligence in a reasonable amount to be determined by a jury, against Defendant Nationwide;

- for actual and compensatory damages, expectancy damages, costs of litigation and attorney's fees for Breach of Contract in a reasonable amount to be determined by a jury, against Defendant Nationwide;

- for actual and compensatory damages, expectancy damages, costs of litigation and attorney's fees for Breach of Good Faith and Fair Dealing in a reasonable amount to be determined by a jury, against Defendant Nationwide;

- for actual and compensatory damages, expectancy damages, costs of litigation and attorney's fees for Unjust Enrichment in a reasonable amount to be determined by a jury, against Defendant Nationwide;

- for actual and compensatory damages, expectancy damages, costs of litigation and attorney's fees for Nuisance under Minn.Stat. § 561.01 in a reasonable amount to be determined by a jury, against Defendant Nationwide;

### As to Both Defendants

- for a judgment and decree and decree that Defendants have engaged in the conduct alleged above, entering Judgment in favor of Plaintiff, and making a judicial determination that Plaintiff owes nothing to these Defendants;

- for all actual compensatory damages suffered;

- for all other recoveries and fees otherwise permitted by these claims and by law;

- for attorney's fees and costs of suit as provided by state and federal;

- for both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

- and for such other and further relief as may be just and proper.

                                  Respectfully submitted,

                                  **THE BARRY LAW OFFICE, LTD**

Dated: November 16, 2021         By:  s/ Peter F. Barry
                                  Peter F. Barry, Esq.
                                  Attorney I.D.#0266577
                                  333 Washington Ave No, Suite 300-9038
                                  Minneapolis, MN 55401-1353

                                  Telephone:  (612) 379-8800
                                  pbarry@lawpoint.com

                                  ***Attorney for Plaintiff***

## <u>VERIFICATION OF COMPLAINT AND CERTIFICATION</u>

STATE OF MINNESOTA            )
                              ) ss
COUNTY OF RAMSEY              )

Pursuant to 28 U.S.C. § 1746, Plaintiff Margaret Byrne verifies, certifies, and declares as follows:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.
6. Each and every exhibit I have provided to my attorneys which has been attached to this Complaint is a true and correct copy of the original, although any included photos may have been resized and/or adjusted to provide better clarity.
7. Except for clearly indicated redactions made by my attorneys where appropriate, I have not altered, changed, modified, or fabricated these exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Nov 16, 2021          *Margaret Byrne*
                      Margaret Byrne (Nov 16, 2021 14:50 CST)
_____   _____
Date                  Signature

## NOTICE TO PRESERVE ALL DOCUMENTS, RECORDINGS, AND TANGIBLE THINGS, AND ALL ELECTRONICALLY STORED INFORMATION ("Notice")

To the Defendant(s) Above:

**As you know, this law firm has been retained to represent the Plaintiff in the above captioned matter ("Lawsuit").**  As used in this notice, the terms "you" and "your" refer to the Defendant(s) above-named and their predecessors, successors, parents, subsidiaries, divisions and affiliates and its respective officers, directors, agents, attorneys, accounts, employees, partners, contractors and other persons occupying similar positions or performing any functions on behalf of Defendant.

**My client respectfully demands that you preserve all recordings, documents, tangible things and electronically stored information that are in anyway relevant to the Lawsuit.** A civil suit has been commenced against you by my client in the District Court herein, related to the matters described herein.

**You have a legal duty to preserve evidence in this matter.**  This duty to preserve evidence exists not only after the formal commencement of litigation, but whenever a party knows or should know that litigation is reasonably foreseeable. The Minnesota Supreme Court has specifically addressed this issue:

> We have said that the spoliation of evidence is the "failure to preserve property for another's use as evidence in pending or future litigation." *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 436 (Minn.1990) (quoting *County of Solano v. Delancy,* 264 Cal.Rptr. 721, 724 n. 4 (Cal.Ct.App.1989)). Further, we have recognized that, regardless of whether a party acted in good or bad faith, "the affirmative destruction of evidence has not been condoned." *Patton,* 538 N.W.2d at 119. The duty to preserve evidence[2] exists not only after the formal commencement of litigation, but whenever a party knows or should know that litigation is reasonably foreseeable. *See id.* at 118–19. Breach of the duty to preserve evidence once such a duty arises may be sanctioned, under a court's inherent authority, as spoliation. *See id.* at 118. Here, we specifically reaffirm our rule that custodial parties have a duty to preserve relevant evidence for use in litigation. *Id.* at 116. We also reaffirm our previously stated rule that, even when a breach of the duty to preserve evidence is not done in bad faith, the district court must attempt to remedy any prejudice that occurs as a result of the destruction of the evidence. *Id.*

<u>Miller v. Lankow</u>, 801 N.W.2d 120, 127–28 (Minn. 2011)

**Once a duty to preserve evidence has arisen, the breach of that duty may subject a party to sanctions under a court's inherent authority as spoliation.** "Courts have long afforded redress for the destruction of evidence * * *." Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc., 456 N.W.2d 434, 436 (Minn.1990).

**Much of the information that is subject to disclosure or responsive to discovery in this case may be stored on your current and former computer systems and other media and devices, including personal digital assistants, voice messaging systems, online repositories, telephone recording systems, hard drives and cell phones.** The term Electronically Stored Information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, digitally, magnetically, optically or otherwise stored as:

- Audio and/or video records of any telephone calls and conversations made related to the events described in the Lawsuit
- digital communications (for example email, voicemail, imaging, scanning, and/or instant messaging);
- email service stores and server information (for example SQL Server, Oracle, Dropbox, Box, lotus, domino.nsf, Microsoft exchange.edb, Google Corporate Gmail, etc.);
- word processing documents (for example Microsoft Word or WordPerfect files and all drafts thereof);
- spreadsheets and tables;
- accounting application data;
- imaging and facsimile files;
- recordings of any conversations with my client;
- phone records of any calls to my client;
- databases (for example Access, Oracle, SQL Server data);
- Contact and relationship data management (for example Outlook, Ask or Interaction);
- Calendar and diary application data;
- online access data (for example temporary internet files, history files and cookies);
- presentations (for example PowerPoint and Corel presentations);
- network access and server activity logs relating to information exchanged between you and third parties, and by you with third parties;
- project management application data;
- backup and archival files;
- letters, documents, or correspondence of whatever kind related to existing loss prevention policies, and changes, updates, alterations made to loss prevention policies for the past three (3) years

**My client hereby demands that you preserve both accessible and inaccessible ESI.** This demand is reasonable and necessary.  Pursuant to the Rules of Civil Procedure, in the event of an eventual civil suit you must identify all sources of ESI you decline to produce and demonstrate why such sources are not reasonably accessible.  For good cause shown in that event, the Court may order production of ESI even if it is not reasonably accessible.  Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the Court's authority.

**Preservation requires your immediate intervention.** You must act immediately to preserve potentially relevant ESI, including, without limitation, information and the earlier of a created or last modified date for ESI concerning any activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand.  Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence.  You must immediately intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI.  Booting a drive, examining its contents or running any application may irretrievably alter the evidence contained therein and constitute spoliation of evidence.

**You are also directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with that litigation hold.**  You are further directed to immediately identify and modify or suspend features of your information systems and devices, which, in routine operation, operate to cause the loss of potentially relevant ESI.  Examples of such features and operations that could result in spoliation include:

- purging the contents of email repositories by age, capacity or any other criteria
- using data or media wiping, disposal, erasure of encryption utilities or devices
- overriding erasing, destroying or discarding backup media
- reassigning, re-imaging or deposing of systems, servers, devices or media
- running antivirus or other programs affecting wholesale metadata alteration
- releasing or purging online storage repositories
- using metadata stripper utilities
- disabling server, packet or local instant messaging login
- executing drive or file defragmentation or compression programs
- shredding or other destruction of documents, routine or otherwise

**You should anticipate that your officers, employees, or others may seek to hide, destroy or alter ESI.**  This is not a concern that is unique to you or your organization.

Rather it is simply conduct that occurs with such regularity that any custodian of ESI and their counsel must anticipate and guard against its occurrence. You are directed to preserve complete backup tape sets (including differentials and incrementals) containing recordings, emails and ESI for any person involved in the activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand, whether inside or outside of your organization and control. You should also take affirmative steps to prevent anyone with access to your data, systems or archives from seeking to modify destroy or hide ESI.

**As an appropriate and cost-effective means of preservation, you should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI.** In the event that you deem it impractical to sequester those systems, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems identified above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods imposes a significant threat of spoliation and data loss. Be advised that a conventional copy, backup or ghosting of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data.

**You should anticipate that certain ESI, including but not limited to recordings, spreadsheets and databases will be sought in the forms or form in which it was ordinarily maintained, that is in native form.** Accordingly, you should preserve ESI in such native forms and should not employ methods to preserve ESI that remove or degrade the ability to search ESI by electronic means or that make it difficult or burdensome to use that information.

**You should further anticipate the need to disclose and produce system and application metadata and act to preserve it.** System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files. As hard copies do not preserve electronic search ability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both the forms.

**We desire to work with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved.** Alternatively, if you

promptly disclose the preservation protocol you intend to employ, perhaps we can now identify any points of disagreement and resolve them.

**A successful and compliant ESI preservation effort requires expertise.**  If you do not currently have such expertise, we urge you to engage the services of an expert in electronic evidence and computer forensics.  Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that is fair to both sides and acceptable to the Court.  I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay.  Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay of production of evidence to which we are entitled, that failure would constitute spoliation of evidence.

**Please confirm in writing no later than five (5) business days from the date of this Notice, that you have taken the steps outlined in this Notice to preserve ESI and tangible documents potentially relevant to this pending action.**  If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

If you retain legal counsel with respect to these matters, please direct this Notice to their immediate attention.  Thank you for your anticipated cooperation in this vital matter.